# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

J.C., *a minor*; B.C., *a minor*; and Mr. R.C.
*and* Mrs. M.C. *in their own right*,

     Plaintiffs,

  v.

GREENSBURG-SALEM SCHOOL
DISTRICT,

     Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 18-1683

Judge Marilyn J. Horan

## OPINION AND ORDER

On December 19, 2018, Plaintiffs filed the present Complaint against Defendant Greensburg-Salem School District.  (ECF No. 1).  Plaintiffs bring various claims against the Defendant District under the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; the Civil Rights Act, 42 U.S.C. § 1983; and Title IX of the Education Amendments, 20 U.S.C. § 1681 *et seq*.  *Id.*  The Defendant District moves to dismiss the Complaint "pursuant to Rules 12(b)(1), 12(b)(6), and 12(f) of the Federal Rules of Civil Procedure."  (ECF No. 5).  The parties provided briefs, (ECF Nos. 6, 10, 13), and argued the Motion before this Court on June 20, 2019.

For the following reasons, the Defendant District's Motion to Dismiss will be denied in part and moot in part, as the Court finds, sua sponte, that it lacks subject matter jurisdiction over several claims.

## I. Factual Background

Plaintiff J.C., a fifteen-year-old boy, is diagnosed with Autism Spectrum Disorder, learning disabilities in math, and a speech and language disorder. (ECF No. 1, at ¶ 23–24). Related to his diagnoses, "J.C. has difficulty with expressive language and communicating needs and feelings, and has social skill deficits." *Id.* at ¶ 25. These deficits "make it difficult for him to interact with peers," as well as "make him more susceptible to bullying and abuse." *Id.* Accordingly, J.C. has received behavioral support services since the fall of 2010. *Id.* at ¶ 26.

J.C. has a younger brother, Plaintiff B.C., who is twelve years old. *Id.* at ¶ 27. The boys' parents are Plaintiffs Mr. R.C. and Mrs. M.C. *Id.* at ¶ 9–10. Mr. R.C. and Mrs. M.C. own their own business, which Mr. R.C. continues to operate. *Id.* at ¶ 85. Until the events at issue in this case, Mrs. M.C. also worked for the business, assisting in managing the business's finances and operations. *Id.* at ¶¶ 85–86. The family resides in the Defendant Greensburg-Salem School District, where the boys were enrolled in school from at least 2012 through the end of the 2014–15 school year. *Id.* at ¶¶ 7–10, 28, 30.

In the summer of 2012, before J.C. began second grade and before B.C. began kindergarten, J.C. reported to his behavior services consultant (who was not an employee of the Defendant District) that another student had exposed his penis to J.C. on the school bus. *Id.* at ¶¶ 28, 30–31. That student, named D.H., "was well-known in Defendant District as a behavior and discipline problem." *Id.* at ¶ 36. After the 2012–13 school year began, J.C. became upset that D.H. "was attempting to put himself in proximity to" B.C., and "J.C. feared D.H. would sexually assault B.C. if J.C. did not protect him." *Id.* at ¶ 32. Mr. R.C. and Mrs. M.C. notified the school of the incident and their concerns, and ultimately met with the school's principal on September 18, 2012 to discuss the matter. *Id.* at ¶ 33. At the meeting, the principal assured the

parents "that she would share the information with J.C.'s teachers so the students could be appropriately supervised." *Id.* at ¶ 35. The parents "trusted that the principal would appropriately address the situation" and that the interactions between the students would be monitored going forward. *Id.* at ¶¶ 34–35, 37.

At the start of the 2013–14 school year, and unknown to J.C.'s parents, J.C. and D.H. were permitted to sit with or near each other at the back of school bus, where the bus driver could not observe their interactions. *Id.* at ¶ 38. D.H. repeatedly victimized J.C. by forcing J.C. to touch his penis and by rubbing his penis on J.C. *Id.* at ¶¶ 39–40. Due to J.C.'s social skills deficits, J.C. did not report these incidents immediately. *Id.* at ¶ 41. Over time, J.C. began displaying, among other things, self-harm behaviors, inability to regulate his emotions, heightened agitation, and difficulty interacting with his brother. *Id.* at ¶¶ 42–43. Mrs. M.C. communicated her concerns about J.C.'s behaviors to the Defendant District, which "failed to take any steps to determine the cause of J.C.'s change in behavior." *Id.* at ¶¶ 44–45.

J.C. and B.C. continued to ride the bus with D.H. the following school year, and "[b]y early February 2015, the sexual abuse had increased" to include D.H. pulling down J.C.'s pants and touching J.C.'s penis. *Id.* at ¶¶ 46–47, 63. On February 5, 2015, J.C. reported the abuse to his learning support teacher, but the teacher did not notify Mr. R.C. or Mrs. M.C. *Id.* at ¶¶ 48–49. Instead, Mrs. M.C. learned of the abuse when J.C. disclosed it to her that afternoon. *Id.* at ¶ 50. The parents took J.C. to the pediatrician and reported the abuse to the local police in the days that followed J.C.'s disclosure. *Id.* at ¶¶ 52, 54. The parents also decided to keep J.C. and B.C. home from school until they could be assured of the boys' safety at school and on the school bus. *Id.* at ¶ 53. They spoke with the principal regarding changes that could be put in place to keep J.C. safe. *Id.* at ¶ 58. The Defendant District offered to provide J.C. with

3

alternative transportation and proposed changing J.C.'s homeroom assignment, as D.H. was also in that classroom. *Id.* at ¶ 59. The parents were dissatisfied with the Defendant District's proposal because it meant changes for J.C. rather than for D.H., which J.C. perceived as punishment. *Id.* at ¶ 60. Additionally, due to his Autism Spectrum Disorder, "J.C. struggled with transitions, and these changes would have a significant impact on him." *Id.*

On February 26, 2015, the parents met with the Defendant District and "confirmed that until Defendant completed its formal investigation of the sexual abuse, J.C. and B.C. would not be returning to school." *Id.* at ¶ 64. The Defendant District failed to complete or finalize its investigation and did not provide a written report to the family. *Id.* at ¶ 65. The Defendant District also did not revise J.C.'s individualized education plan (IEP) to ensure that J.C. received the support and supervision he needed. *Id.* at ¶¶ 66, 74. Consequently, Mr. R.C. and Mrs. M.C. kept the boys at home for the rest of the school year. *Id.* at ¶¶ 67, 76. Although the Defendant District sent letters to the parents in March 2015 regarding the boys' absences, the Defendant District did not meet with the parents about attendance, discuss attendance during J.C.'s IEP meeting in April 2015, or pursue truancy charges against the parents. *Id.* at ¶¶ 69, 75. In August 2015, Mr. R.C. and Mrs. M.C. enrolled their sons in a cyber charter school, where the boys still attend. *Id.* at ¶ 77.

The family contends that as a result of the sexual abuse and the Defendant District's failure to respond appropriately, the family has been, and continues to be, harmed mentally, emotionally, and financially. The family alleges that "J.C. continues to manifest and express anxiety over the February 2015 sexual abuse and the peer involved," and that he "remains fearful of seeing that peer again." *Id.* at ¶ 82. B.C. has also "developed issues with anger and frustration, and his relationship with J.C. was further strained by these incidents," because he

4

"blames J.C. for his removal from Defendant District." *Id.* at ¶¶ 83, 91. The family further alleges that "Mrs. M.C. was traumatized by J.C.'s abuse and disclosure, and to date experiences panic attacks." *Id.* at ¶ 78. She has "required extensive support" in order to care for J.C. and B.C., including in-home tutoring to support the boys in their cyber school program. *Id.* at ¶¶ 78–80. Additionally, Mrs. M.C. "was unable to work consistently for the family business," which "resulted in tremendous financial burden" on the family. *Id.* at ¶ 78. Mr. R.C., too, "has experienced significant anxiety and guilt over not having been able to protect J.C." *Id.* at ¶ 89. Lastly, these incidents have had a negative impact on the parents' marriage, and the family "will require ongoing therapeutic supports to address the traumas they have individually and collectively experienced." *Id.* at ¶¶ 87, 92.

As a result of the foregoing, the parents filed an administrative due process complaint with the Office for Dispute Resolution on May 17, 2017. *Id.* at ¶ 16. They alleged that the Defendant District violated the Individuals with Disabilities Education Act (IDEA), § 504 of the Rehabilitation Act, and the Americans with Disabilities Act (ADA) "by failing to provide J.C. a free, appropriate public education" and by "discriminat[ing] against J.C. on the basis of his disability." (ECF No. 16, at 2; ECF No. 1, at ¶ 16). Related to the due process complaint, the parties "entered into a Tolling Agreement, establishing the filing date for purposes of the timely filing determination as February 17, 2017." (ECF No. 1, at ¶ 17). Following several hearings, the Hearing Officer issued a decision on February 15, 2018, finding that the Defendant District failed in its "free, appropriate public education" (FAPE) obligations to J.C. under the IDEA, from February 17, 2015 through the end of the 2014–15 school year. *Id.* at ¶ 20. The Hearing Officer also found that the Defendant District had acted with deliberate indifference toward J.C. and thus had discriminated against J.C. in violation of § 504. *Id.* at ¶ 21. The Hearing Officer

ordered the Defendant District to provide six hours of compensatory education per day for each day that the Defendant District was in session from February 17, 2015 through the end of the 2014–15 school year. *Id.* at ¶ 20. Lastly, the Hearing Officer denied the parents' claim for reimbursement for private professional services they obtained for J.C. as a result of the Defendant District's failure to provide a FAPE, because the parents did not present evidence sufficient to make a determination. (ECF No. 16, at 23–24). Neither the parents nor the Defendant District appealed the Hearing Officer's decision. (ECF No. 1, at ¶ 22).

On December 19, 2018—ten months after the issuance of the Hearing Officer's decision, and more than three years and ten months after J.C.'s disclosure of continued sexual abuse by D.H.—Plaintiffs, Mr. R.C., Mrs. M.C., J.C., and B.C., filed the present Complaint. (ECF No. 1). In Counts I and II, J.C. asserts violations of § 504 of the Rehabilitation Act and the ADA, respectively, claiming that because the Hearing Officer found the Defendant District acted with deliberate indifference, Plaintiffs are entitled to compensatory damages. *Id.* at ¶¶ 93–103. In Counts III and IV, Mr. R.C., Mrs. M.C., and B.C. bring associational claims under § 504 of the Rehabilitation Act and the ADA, respectively. *Id.* at ¶¶ 104–21. In Count V and VI, J.C. asserts § 1983 claims for breach of a special custodial relationship and stated-created danger, respectively. *Id.* at ¶¶ 122–43. In Count VII, Mr. R.C. and Mrs. M.C. also bring a § 1983 claim, asserting a violation of the parents' liberty interest "in the parenthood and companionship of their child," and in "the maintenance and integrity of their family." *Id.* at ¶¶ 144–148. In Count X,[1] J.C. asserts a violation of Title IX of the Education Amendments of 1972, caused by sex-

---

[1] There is neither a Count VIII nor a Count IX in the Complaint, but for simplicity's sake, the Court will continue to refer to each Count as labeled in the Complaint.

based harassment. *Id.* at ¶¶ 149–52. Lastly, in Count XI, Plaintiffs assert a claim for attorneys' fees and costs under § 504 and the ADA. *Id.* at ¶¶ 153–61.

The Defendant District moves to dismiss the Complaint "pursuant to Rules 12(b)(1), 12(b)(6), and 12(f)[2] of the Federal Rules of Civil Procedure," arguing that Counts I and II were not timely filed; that the remaining claims are barred by the applicable statutes of limitations; and that the § 1983 claims are improperly duplicative of the § 504 and ADA claims, as well as legally insufficient. (ECF Nos. 5, 6).

## II. Legal Standards

A. Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a court may dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Subject matter jurisdiction is the court's "[j]urisdiction over the nature of the case and the type of relief sought; the extent to which a court can rule on the conduct of persons or the status of things." *Subject Matter Jurisdiction*, *Black's Law Dictionary* (10th ed. 2014). In other words, "a court's subject-

---

[2] Rule 12(f) provides for a motion to strike, not a motion to dismiss. Fed. R. Civ. P. 12(f). The Defendant District perhaps recognizes this because, although not explicitly linked to Rule 12(f), paragraph 18 of the Motion states that "the references to § 1983 in Plaintiff's [sic] Complaint should be stricken." (ECF No. 5, at ¶ 18). However, the Defendant District's basis for striking references to § 1983 in the Complaint appears to be that the § 1983 claims are duplicative of the § 504 and ADA claims—one of the Defendant District's primary arguments for dismissal of the § 1983 claims under Rule 12(b)(6). (ECF No. 5, at ¶¶ 15–17; ECF No. 6, at 8–9). The Defendant District offers no further explanation or argument anywhere else in the Motion, and makes no mention at all of the motion to strike or Rule 12(f) in its supporting brief. It seems, then, that the 12(f) motion is unnecessary; after all, deciding the 12(b)(6) motion necessarily resolves any issues contemplated by the Defendant District when it included Rule 12(f) in its Motion. Additionally, oral argument did not shed any light on 12(f)'s relation to the Defendant District's Motion, as the parties largely rested on their briefs, causing the entire hearing to last only approximately six minutes. The Court, therefore, will address the Defendant District's Motion solely on the bases of subject matter jurisdiction and failure to state a claim.

matter jurisdiction is its power to hear cases." *Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553, 560 (2017). The plaintiff has the burden of establishing that the court has subject matter jurisdiction, *Reg'l Med. Transp., Inc. v. Highmark, Inc.*, 541 F. Supp. 2d 718, 725 (E.D. Pa. 2008), and the defendant can challenge whether the plaintiff has done so, through either a facial challenge or a factual challenge to the complaint. *In re Horizon Healthcare Servs. Data Breach Litig.*, 846 F.3d 625, 632 (3d Cir. 2017).

In a facial challenge, the court looks to the face of the complaint and accepts as true the facts alleged by the plaintiff. *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). If the court cannot conclude, based on face of the complaint, that jurisdictional requirements are met, then the court must dismiss the complaint. *In re Horizon Healthcare Servs. Data Breach Litig.*, 846 F.3d at 633 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In a factual challenge, however, the plaintiff's factual allegations are not presumed to be true, and the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Hartig Drug Co.*, 836 F.3d at 268.

Lastly, even if the defendant does not mount a challenge under Rule 12(b)(1), the court has "an independent obligation to determine whether subject-matter jurisdiction exists." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). The court cannot exercise jurisdiction where Congress has not given it, even if all parties assume subject matter jurisdiction exists. *Hartig Drug Co.*, 836 F.3d at 267.

B. Rule 12(b)(6)

In deciding a motion to dismiss a complaint under Rule 12(b)(6), a court must first "accept all factual allegations as true" and "construe the complaint in the light most favorable to the plaintiff." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (internal quotations omitted).

The court then must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id.* A complaint is sufficient only when it is facially plausible, meaning that the court is able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). To be plausible on its face, the complaint must contain more than "[t]hreadbare recitals of the elements of a cause of action" and "mere conclusory statements." *Id.* The court need not "accept unsupported conclusions and unwarranted inferences." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013).

When a court grants a motion to dismiss, the court "must permit a curative amendment unless such an amendment would be inequitable or futile." *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010) (internal quotations omitted). Further amendment is inequitable where there is "undue delay, bad faith, dilatory motive, [or] unfair prejudice." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). Amendment is futile "where an amended complaint 'would fail to state a claim upon which relief could be granted.'" *M.U. v. Downingtown High Sch. E.*, 103 F. Supp. 3d 612, 631 (E.D. Pa. 2015) (quoting *Great Western Mining & Mineral Co.*, 615 F.3d at 175).

## III. Discussion

A. Subject matter jurisdiction over Counts I and II

In Counts I and II of the Complaint, J.C. alleges that he is entitled to compensatory damages under § 504 of the Rehabilitation Act and the ADA as a result of the Hearing Officer's determination that the Defendant District intentionally discriminated against him on the basis of his disability. (ECF No. 1, ¶¶ 93–103). The Defendant District moves to dismiss these Counts as untimely because Plaintiffs did not bring these claims within ninety days of the Hearing

9

Officer's decision.  (ECF No. 5, at ¶ 24; ECF No. 6, at 13).  Although the Defendant District gives this argument short shrift, providing the Court only with a portion of a statute and the conclusion that these two claims are untimely, the Defendant District's argument amounts to a motion to dismiss for lack of subject matter jurisdiction on the basis that Plaintiffs purportedly failed to follow the IDEA's administrative procedures.

The IDEA requires that participating states, including Pennsylvania, provide a free, appropriate public education (FAPE) to children who have special needs.  20 U.S.C. § 1412(a)(1).  These participating states "must comply with detailed procedures for identifying, evaluating, and making placements for students with disabilities, as well as procedures for developing IEPs." *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 271–72 (3d Cir. 2014).  They must also "implement specified procedural safeguards to ensure children with disabilities and their parents[3] are provided with due process." *Id.* at 272.  The procedural safeguards, often referred to as the IDEA's administrative process, allow parents or the school to file a due process complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Id.* at 272; 20 U.S.C. § 1415(b)(6).  Additionally, if a plaintiff wants to pursue claims under the Constitution, the ADA, title V of the Rehabilitation Act, or other federal laws protecting the rights of children with disabilities, that are based on a set of circumstances for which the IDEA provides relief, those claims must be included in the due process complaint along with the IDEA claim.  20 U.S.C. § 1415(*l*); *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743,

---

[3] Under the IDEA, the definition of "parent" includes natural, adoptive, or foster parents, legal guardians, and "individual[s] acting in the place of a natural or adoptive parent . . . with whom the child lives."  20 U.S.C. § 1401(23).

750 (2017). Following the due process complaint, the parties may participate in an impartial due process hearing. 20 U.S.C. § 1415(f)(1)(A).

In Pennsylvania, the impartial due process hearing is conducted before a hearing officer. 22 Pa. Code § 14.162. A party aggrieved by the hearing officer's findings and decision may appeal the findings and decision to the federal district court. 20 U.S.C. § 1415(i)(1)–(2); 22 Pa. Code § 14.162(o). Such an appeal must be filed within ninety days of the hearing officer's decision. 20 U.S.C. § 1415(i)(2)(B). If neither party appeals, then the hearing officer's decision is final and binding, and a plaintiff may later file suit in federal district court to enforce a hearing officer's decision. 20 U.S.C. § 1415(i)(1)(A); *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 276 (3d Cir. 2014). In other words, once a final decision is reached, and administrative remedies are therefore exhausted, the district court has subject matter jurisdiction over plaintiffs' claims. 20 U.S.C. § 1415(i); *see also Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 130 (3d Cir. 2017) (noting that IDEA administrative exhaustion is a jurisdictional requirement).

Additionally, the remedies available under the IDEA are reimbursement for private educational placement, compensatory education, and attorneys' fees. *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 185–86 (3d Cir. 2009). The IDEA, however, does not allow for compensatory damages. *Id.* This is so because Congress did not intend the IDEA to provide for tort-like damages; rather, the IDEA's purpose is to ensure students receive a FAPE, and then provide restitutionary measures when a school fails in its FAPE obligations. *Id.* at 184–85. The fact that compensatory damages are not available under the IDEA, combined with the IDEA's requirement that other claims seeking relief for the denial of FAPE must be included in the due process complaint, means that children with disabilities and their parents who seek compensatory damages for IDEA-related harm generally must do so under a different statute, such as § 504 or

11

the ADA, after they have exhausted administrative remedies as to claims under those other statutes.

In the due process complaint before the hearing officer, J.C.'s parents alleged that the Defendant District denied J.C. a FAPE under the IDEA, § 504, and the ADA. (ECF No. 16, at 2). Neither party appealed the hearing officer's decision, (ECF No. 1, at ¶ 22), which means that the hearing officer's decision is final and that the administrative remedies have been exhausted as to the IDEA, § 504, and the ADA claims filed in the due process complaint. Additionally, because this present Complaint is not an appeal of the hearing officer's decision, but instead contains claims for compensatory damages under § 504 and the ADA (which they could not recover through the IDEA administrative process), the ninety-day appeal window does not apply. Accordingly, the Court has subject matter jurisdiction over Counts I and II, and the Defendant District's Motion to Dismiss is therefore denied as to this issue.

B. Subject matter jurisdiction over Counts III through X

In the course of analyzing subject matter jurisdiction as to Counts I and II, the issue arose as to whether the Court has subject matter jurisdiction over all of the other claims in the Complaint. Because the Court has "an independent obligation to determine whether subject-matter jurisdiction exists," *Arbaugh*, 546 U.S. at 514, the Court now considers a sua sponte motion to dismiss Counts III through X for lack of subject matter jurisdiction due to said claims' apparent relation to the underlying IDEA claim.

As noted above, the IDEA's core guarantee is a child's right to a FAPE. 20 U.S.C. § 1412(a)(1). A FAPE includes not only "'instruction' tailored to meet a child's 'unique needs,'" but also "sufficient 'supportive services' to permit the child to benefit from that instruction." *Fry*, 137 S. Ct. at 748–49 (quoting 20 U.S.C. § 1401(26), (29)). And, as explained

above, if in addition to an IDEA claim, a plaintiff wants to pursue claims under the Constitution, the ADA, title V of the Rehabilitation Act, or other federal law protecting the rights of children with disabilities, any of those claims that are based on a set of circumstances for which the IDEA provides relief must be included in, and exhausted through, the IDEA administrative process.  20 U.S.C. § 1415(*l*); *Fry*, 137 S. Ct. at 750.

Since the IDEA's enactment, courts have wrestled with the scope of the IDEA's exhaustion requirement.  *See Wellman*, 877 F.3d at 131.  In *Fry v. Napoleon Community Schools*, the Supreme Court addressed the issue, holding that exhaustion is required when the gravamen, or the crux, of the plaintiff's suit is "the denial of the IDEA's core guarantee," that is, the denial of a FAPE.  *Fry*, 137 S. Ct. at 748.  In addressing the Frys' § 504 and ADA claims, the Court explained that there is a difference between claims that address the denial of a FAPE and claims that address disability-based discrimination, in that "[a] school's conduct toward [a student with disabilities]—say, some refusal to make an accommodation—might injure her in ways unrelated to a FAPE, which are addressed in statutes other than the IDEA." *Id.* at 754.  To aid in determining whether the gravamen of a claim is the denial of a FAPE, rather than a claim for disability-based discrimination, the Court stated, "One clue . . . can come from asking a pair of hypothetical questions." *Id.* at 756.  The first question is, "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library?" *Id.*  The second question is, "could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance?" *Id.*  If the answer to both is "yes," it is likely that the gravamen of the complaint is something other than the denial of a FAPE. *Id.*  On the other hand, if the answer to both questions is "no," then it is likely that the gravamen of the complaint is a denial of a FAPE, and exhaustion is required. *Id.*

The same distinction and similar hypothetical questions apply to determining whether the gravamen of constitutional claims and claims under other federal laws is the denial of a FAPE. *See Wellman*, 877 F.3d at 134–35.

Lastly, the Court in *Fry* further stated that yet another clue that the gravamen of the Complaint is the denial of a FAPE is that the "plaintiff has previously invoked the IDEA's formal procedures to handle the dispute," because "prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term." *Fry*, 137 S. Ct. at 757.

It is under this framework that the Court now addresses Plaintiffs' claims in the present Complaint, beginning with J.C.'s § 1983 and Title IX claims, and then addressing the parents' and B.C.'s claims.

### i. J.C.'s § 1983 claims

In Counts V and VI of the Complaint, J.C. brings two claims under 42 U.S.C. § 1983, alleging that the Defendant District violated his Fourteenth Amendment due process rights under the "special relationship" and state-created danger theories, respectively. (ECF No. 1, at ¶¶ 122–43). As an initial matter, although the Fourteenth Amendment's Due Process Clause prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, it "does not generally impose an affirmative obligation upon states to protect individuals from private citizens," *Morrow v. Balaski*, 719 F.3d 160, 167 (3d Cir. 2013). The "special relationship" and state-created danger theories are narrow exceptions to this general rule. *Id.*

*a. Special relationship.* First, the "special relationship" exception applies where "a special relationship has been established because 'the State takes a person into its custody and

14

holds him there against his will.'" *Id.* (quoting *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 199–200 (1989)). Such a relationship exists between the state and its citizens who are incarcerated, involuntarily committed to mental health institutions, or suffering "other similar restraint of personal liberty" because "'it is the State's affirmative act of restraining the individual's freedom to act on his own behalf . . . which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.'" *Id.* at167–68 (quoting *DeShaney*, 489 U.S. at 200). In *Morrow*, the Third Circuit considered whether, and under what circumstances, a "special relationship" arises between a public school and its students, such that the school has "a constitutional duty to protect students from abuse inflicted by fellow students." *Id.* at 163. Under facts similar to Plaintiffs' case here, the court held that public schools do not generally have a such a constitutional duty, but allowed that there is a possibility that a special relationship could arise "between a *particular* school and *particular* students under certain and unique and narrow circumstances." *Id.* at 171. The court explained, however, that "any such circumstances must be so significant as to forge a different kind of relationship between a student and a school than that which is inherent in the discretion afforded school administrators as part of the school's traditional *in loco parentis* authority or compulsory attendance laws." *Id.*

  J.C. alleges that the significant circumstances that "forge a different kind of relationship" here are that "[t]he IEP team possessed specialized knowledge of J.C.'s unique needs. . . . and was obligated under the IDEA to ensure he was provided with the supports necessary to access his educational programming." (ECF No. 1, at ¶ 126). In other words, J.C. would have the Court find that the Defendant District's duty to provide a FAPE under the IDEA is sufficient to create a "special relationship," and that the Defendant District's failure in that duty violated the

Fourteenth Amendment. *See id.* at ¶ 127. J.C.'s "special relationship" claim, in Count V, plainly

seeks relief for a denial of a FAPE, and as a result, is subject to the IDEA's administrative

exhaustion provision. Because the administrative process has not been exhausted as to Count V,

this Court does not have subject matter jurisdiction over it and it must be dismissed.

    *b. State-created danger.* Second, as to the state-created danger exception, "liability may

attach where the state acts to *create* or *enhance* a danger that deprives the plaintiff of his or her

Fourteenth Amendment right to substantive due process." *Morrow*, 719 F.3d at 177. A plaintiff

proceeding under this theory must prove, in part, that there existed "'a relationship between the

state and the plaintiff . . . such that the plaintiff was a foreseeable victim of the defendant's acts'"

and that "'a state actor affirmatively used his or her authority in a way that created a danger to

the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at

all.'" *Id.* (quoting *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006)).

    In the present case, J.C. alleges in Count VI that a special relationship existed such that

he "was a student with a disability in [the Defendant District's] care and protection as required

by law." (ECF No. 1, at ¶ 139). J.C. also alleges that the Defendant District's putative

affirmative act, which created the danger that he suffered, was that the Defendant District

"plac[ed] J.C. on the bus with student D.H., and subsequently fail[ed] to provide the appropriate

supervision required to ensure J.C. was not victimized again." *Id.* at ¶ 140. J.C. thus predicates

his state-created danger claim on the Defendant District's duty, and subsequent failure, to

provide to him the supportive services required to provide a FAPE under the IDEA. Therefore,

Count VI seeks relief for the denial of a FAPE to J.C., and is subject to the exhaustion

requirement. Like the "special relationship" claim in Count V, the administrative process has not

16

been exhausted as to the state-created danger claim in Count VI, and, consequently, Count VI must be dismissed for lack of subject matter jurisdiction.

### ii. J.C.'s Title IX claim

In addition to his § 1983 claims, J.C. alleges in Count X that the Defendant District violated Title IX of the Education Amendments by "creat[ing] and/or subject[ing] J.C. to a hostile educational environment." (ECF No. 1, at ¶ 151). To establish a hostile educational environment, or harassment, claim under Title IX, a plaintiff must show, among other things, that the defendant school was "deliberately indifferent to sexual harassment, of which [it has] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999). In the Title IX context, "[a] school is 'deliberately indifferent' to harassment 'only where the [school district's] response to the harassment or [failure to respond] is clearly unreasonable in light of the known circumstances.'" *M.S. v. Susquehanna Twp. Sch. Dist.*, 2017 U.S. Dist. LEXIS 47916, at *21 (M.D. Pa. Mar. 29, 2017) (quoting *Davis*, 526 U.S. at 648). This "reasonable response doctrine implies a duty on the part of the [school], upon notice of possible sexual harassment, to promptly investigate and if necessary to take remedial action." *Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 369 (W.D. Pa. Nov. 13, 2008).

It appears, then, that a school's duty to respond to sexual harassment can arise independent of whether a child has disabilities—or stated differently, the school's duty to provide a FAPE under the IDEA is generally not the basis on which a school's duty to respond to harassment arises. This distinction aligns with *Fry*, and is most clearly seen in the second of the two hypothetical questions posed by the Court. That question—"could an *adult* at the school—

17

say, an employee or visitor—have pressed essentially the same grievance?"—can be reframed in

the Title IX context as, could a student without disabilities have pressed essentially the same

grievance?  If so, claim probably does not seek relief for denial of a FAPE.

In the present case, J.C. was subjected to multiple incidents of sexual misconduct by a

fellow student.  J.C. seeks relief for the Defendant District's failure to reasonably respond to the

alleged hostile educational environment, not for the Defendant District's denial of a FAPE.

Therefore, J.C.'s Title IX claim in Count X is not subject to the IDEA's exhaustion requirement,

and the Court has subject matter jurisdiction over it.

### iii. Parents' § 1983 claim

In Count VII, Mr. R.C. and Mrs. M.C. assert a claim under § 1983, based on an alleged

violation of their Fourteenth Amendment liberty interest "in the parenthood and companionship

of their child" and in "the maintenance and integrity of their family."  (ECF No. 1, at ¶¶ 144–48).

Specifically, the parents allege that the Defendant District's "fail[ure] to adequately supervise

J.C., resulting in his being victimized on the bus, was the proximate cause of the loss and

diminution of these rights."  *Id.* at ¶ 147.  Just as in J.C.'s § 1983 claims, the parents' § 1983

claim is based on the Defendant District's duties under the IDEA, and thus a denial of FAPE.  In

fact, Plaintiffs plainly recognize the close nexus between the parents § 1983 claim and J.C.'s

IDEA and IDEA-related claims.  In response to the Defendant District's argument that the claim

is barred by the statute of limitations, Plaintiffs contend that the statute of limitations had not run

yet, because the parents' § 1983 claim is "inextricably intertwined" with the claims that were

required to be exhausted.  (ECF No. 10, at 6).  Plaintiffs go on to state, "More specifically, in the

event that Hearing Officer Skidmore had not determined that Defendant violated the rights

outlined by the IDEA, Parents would not have a viable claim to pursue."  *Id.*  The Court agrees,

18

though unfortunately for Plaintiffs, this means that the administrative process has not been

exhausted as to the parents' § 1983 claim.  The Court therefore does not have subject matter

jurisdiction over Count VII, and it must be dismissed.

*iv. Parents' associational claims*

Next, in Counts III and IV, Mr. R.C. and Mrs. M.C. assert claims for associational

discrimination under § 504 and the ADA.  (ECF No. 1, at ¶¶ 104–21).  They allege in the

Complaint that "the Hearing Officer lacked jurisdiction to decide Plaintiffs' associational

discrimination claims," but they offer no indication as to why this is the case.  To the contrary, it

appears that a hearing officer can have jurisdiction over parents' associational claims.  In

*Batchelor v. Rose Tree Media School District*, decided three years before *Fry*, the Third Circuit

also addressed the scope of the IDEA's exhaustion requirement, though on more specific

grounds than in *Fry*.  There, the Third Circuit held that a claim regarding a school district's

retaliation against a child or that child's parent, in violation of the ADA or § 504, for enforcing

the child's right to a FAPE must be exhausted through the IDEA administrative process.

*Batchelor*, 759 F.3d at 273–74.  The Third Circuit explained that "there is a logical path to be

drawn from the [parent's and child's] claims of retaliation to the District's failure to provide, and

[the parent's] effort to obtain" a FAPE for the child.  *Id.* at 274–75.  Retaliation claims based on

a parent's or child's enforcement of IDEA rights therefore "relate unmistakably" to the provision

of a FAPE, and as such, the plain language of the IDEA requires exhaustion.  *Id.* at 274–75.

Although *Batchelor* was decided before *Fry*, the Third Circuit's conclusion regarding parents'

and special needs children's retaliation claims is in line with *Fry*'s "gravamen" test, and the

holding in *Batchelor* thus remains good law.  *See S.D. v. Haddon Heights Bd. of Educ.*, 722 Fed.

App'x 119, 127 (3d Cir. 2018).

Here, Mr. R.C.'s and Mrs. M.C.'s associational claims under § 504 and ADA are akin to the retaliation claims in *Batchelor*. Just like in *Batchelor*, there is a "logical path" between the alleged discrimination and Defendant District's failure to provide, and the parents' effort to obtain, a FAPE for J.C. Plaintiffs plainly state this in their Complaint, in that Mr. R.C. and Mrs. M.C. allege that the Defendant District discriminated against them "because of their association with J.C. by continuously failing to provide sufficient supervision and support, despite Mr. R.C. and Mrs. M.C.'s constant efforts and requests, to allow J.C. to access his education." (ECF No. 1, at ¶ 109). The parents' claims thus "relate unmistakably" to the denial of a FAPE to J.C., very much in the same way that the parent's retaliation claim in *Batchelor* related the denial of FAPE.

Additionally, under the *Fry* test, and using the hypothetical questions posed by the Supreme Court as a guide, it is clear that the gravamen of the parents' § 504 and ADA claims is that their child was denied a FAPE. As to the first hypothetical question—whether the plaintiff could have brought essentially the same claim against a non-school public facility—the answer is no. Public schools that receive federal funds under the IDEA are the only public facilities responsible for providing a FAPE—which, again, includes sufficient supportive services—and a discrimination claim based on a failure to "supervise and support" so that a child can access his education cannot logically be brought against a non-school public facility. As to the second hypothetical question—whether an adult, such as an employee or visitor, could have brought the same claim—although this question is perhaps not directly on point, the answer is likewise no. Neither a visitor to the school nor a non-parent adult would have standing to bring a claim based on the school's failure to provide supervision and support to a child. Because the answer to both questions is no, and because the parents' claims are clearly based on the Defendant District's failure to provide J.C. with a FAPE, Mr. R.C. and Mrs. M.C. were required to exhaust

administrative remedies as to their associational claims under the ADA and § 504.  Therefore,

Counts III and IV, as they pertain to Mr. R.C. and Mrs. M.C., must be dismissed for lack of

subject matter jurisdiction.

>    *v. Brother's associational claims*

In contrast to the parents' associational claims, the analysis of B.C.'s associational claims

under the ADA and § 504, in Counts III and IV, yields a different result.  The IDEA provides

relief to children with disabilities and to their parents.  20 U.S.C. § 1412(a)(6); *see also*

*Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 529 (2007) (holding that the "IDEA includes

provisions conveying rights to parents as well as to children").  Based on a plain reading of the

statute, siblings are not included, and, consequently, they neither have rights under the IDEA nor

standing to bring claims to enforce another's rights under the IDEA.  Therefore, the IDEA does

not provide an administrative process by which a sibling, who does not have special needs in his

own right, can seek relief for associational discrimination.  B.C., then, was not required to

exhaust administrative remedies prior to bringing his claims in federal district court.  Thus, this

Court has subject matter jurisdiction over B.C.'s claims in Counts III and IV.

## B. Statutes of limitations

In addition to challenging Counts I and II on the basis of subject matter jurisdiction, the

Defendant District challenges Counts II through X on the basis that these claims are time-barred

by the statute of limitations.  (ECF No. 6, at 6).  The Defendant District's argument appears to be

that the statute of limitations for each of these claims is two years, and that the two years began

to run in early February 2015.  *Id.* at 7–8.  Although the Defendant District correctly states the

law in some parts of its argument, the Defendant District leaves out other relevant law altogether.

Additionally, Plaintiffs dispute the Defendant District's conclusion, arguing instead that a minority tolling rule applies to J.C.'s and B.C.'s claims; that Mr. R.C.'s and Mrs. M.C.'s claims are timely under the discovery rule; and that Mr. R.C.'s and Mrs. M.C.'s claims are "inextricably intertwined" with the claims that were subject to administrative exhaustion.[4]  (ECF No. 10, at 2–6).

Because the ADA, § 504 of the Rehabilitation Act, § 1983, and Title IX of the Education Amendments do not contain statutes of limitations, courts apply the most analogous or most appropriate state statute of limitations to claims brought under these statutes.  *See Wilson v. Garcia*, 471 U.S. 261, 268 (1985) (explaining standard for borrowing statutes); *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 602 (3d Cir. 2015) (regarding § 1983); *P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009) (regarding § 504); *Burkhart v. Widener Univ., Inc.*, 70 Fed. App'x. 52, 53 (3d Cir. 2003) (regarding the ADA); *Bougher v. University of Pittsburgh*, 882 F.2d 74, 77–78 (3d Cir. 1989) (regarding Title IX).  For ADA, § 1983, Title IX, and non-FAPE-based § 504 claims brought before the federal courts located in Pennsylvania, the Third Circuit has held that the most appropriate and analogous state statute of limitations is Pennsylvania's two-year personal injury statute of limitations.  *Pearson*, 775 F.3d at 602; *Burkhart*, 70 Fed. App'x. at 53; *Bougher*, 882 F.2d at 78.  For FAPE-based § 504 claims, however, the Third Circuit has held that the IDEA's two-year statute of limitations applies.  *P.P.*, 585 F.3d at 736–37; *see also Patrick B. v. Paradise Protectory & Agric. Sch., Inc.*, 2012 U.S. Dist. LEXIS 109507, at *14–17 (M.D. Pa. Aug. 6, 2012).  The Third Circuit explained that this is so because "[i]t does not make sense that the virtually identical claims made under [the IDEA

---

[4] Although the Court has determined that it does not have subject matter jurisdiction over the parents' claims and J.C.'s § 1983 claims, the Court will still address the statute of limitations argument as it relates to futility of amendment of the Complaint.

and § 504] would be treated differently from a statute-of-limitations perspective." *P.P.*, 585 F.3d at 736.

As to the time at which the applicable statute of limitations begins to run for ADA, § 1983, Title IX, and non-FAPE-based § 504 claims, Pennsylvania law states that a cause of action for personal injury accrues "when an injury is inflicted and the corresponding right to institute a suit for damages arises." *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011). Under the discovery rule, a "statute of limitations begins to run when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim." *Stephens v. Clash*, 796 F.3d 281, 288 (3d Cir. 2015). It is irrelevant that a plaintiff may be ignorant as to the full extent of his injury, "so long as the plaintiff discovers or should have discovered that he was injured." *Id.* Similarly, under the IDEA, and consequently FAPE-based § 504 claims, the "statute of limitations is triggered when the parent knew or should have known about the action that forms the basis of the complaint." *J.L. v. Ambridge Area Sch. Dist.*, 622 F. Supp. 2d 257, 265–66 (W.D. Pa. 2008).

Lastly, when borrowing a statute of limitations from the forum state's law, federal courts are to also incorporate the forum state's tolling rules. *Weis-Buy Servs. v. Paglia*, 411 F.3d 415, 422 (3d Cir. 2005). Under Pennsylvania law, a statutory minority tolling rule provides that where a cause of action accrues when the plaintiff is a minor, the statute of limitations does not begin to run until the plaintiff reaches the age of majority. 42 Pa. Cons. Stat. § 5533(b). In the case of the two-year statute of limitations for personal injury claims—which, again, applies to ADA, § 1983, Title IX, and non-FAPE-based § 504 claims—the limitations period for claims that accrued during a plaintiff's minority does not begin to run until the minor-plaintiff's eighteenth birthday. Pennsylvania's minority tolling rule does not apply, however, to FAPE-

23

based § 504 claims, because the borrowed statute of limitations is from the IDEA, not from Pennsylvania law. *Patrick B.*, 2012 U.S. Dist. LEXIS 109507, at *18. Additionally, the IDEA does not contain a minority tolling provision, and instead contains only two narrow exceptions to its two-year statute of limitations. *Id.*

Applying the applicable statutes of limitations and related rules to the claims here, J.C.'s ADA, § 1983, and Title IX claims, found in Counts II, V, VI, and X, and B.C.'s ADA claim, in Count IV, are not time-barred. Both J.C. and B.C. are still minors, so the statute of limitations as to these claims has not yet begun to run. Additionally, regarding B.C.'s associational claim under § 504 in Count III, this claim is more akin to an ADA associational discrimination claim than it is to a FAPE-based, or IDEA-related, claim. Although B.C.'s claim grows out of the Defendant District's alleged failure to provide a FAPE to J.C., the harm B.C. alleges he suffered is that he, too, was unable to return to school and access his right to education, found in the Fourteenth Amendment, not the IDEA. His claim is thus not "virtually identical" to a claim brought under the IDEA. Because B.C.'s § 504 claim is not FAPE-based, Pennsylvania's personal injury statute of limitations and minority tolling provisions apply. Therefore, like B.C.'s ADA claim, the statute of limitations has not yet run as to his § 504 claim in Count III. In sum, all of J.C.'s and B.C.'s claims, in Counts II through VI and Count X, were filed within the applicable statute of limitations

As to the parents' ADA, § 504, and § 1983 claims, these claims are time-barred by application of the two-year personal injury statute of limitations. The incidents in question occurred in 2015, causing the statute of limitations to run out in 2017. Plaintiffs argue, however, that under the discovery rule, the parents' claims are timely. (ECF No. 10, at 5). Plaintiffs explain that "it was not until later, when it became clear that Defendant was unwilling to

appropriately address the issues or to support their children that [the parents] were injured." *Id.*
The Court agrees with Plaintiff's contention about when the injury occurred—that is, the time at
which it became clear that the Defendant District was unwilling to address the relevant issues—
but unfortunately for Plaintiffs, the facts alleged in the Complaint show that this occurred
between February 2015 and the end of the 2014–15 school year.  After all, if the parents had not
been aware of the Defendant District's unwillingness to address safety issues, they would have
continued to send their children school rather than keeping them home.  Furthermore, under the
discovery rule, the fact that the parents could not know the full extent of their injury until much
later is irrelevant, because they knew that the injury had occurred.  Thus, even if the
administrative exhaustion requirement did not apply to the parents' claims, and this Court had
subject matter jurisdiction, the parents' claims fail because they were not filed within the statute
of limitations.  Therefore, amendment as to the parents' claims in Counts III, IV, and VII is
futile, and leave to amend is denied as to those claims.

C. Defendant's remaining arguments as to the § 1983 claims

        Lastly, the Defendant District argues that all three § 1983 claims, in Counts V, VI, and
VII, are improperly duplicative of the § 504 and ADA claims, and that J.C.'s § 1983 claims, in
Counts V and VI, are legally insufficient.  (ECF No. 6, at 8–13).  Based on the foregoing
discussion and determinations regarding subject matter jurisdiction as to each of these claims, the
Court does not reach these arguments, and the Defendant District's Motion is moot as to these
issues.

**IV. Conclusion**

25

THEREFORE, based on the foregoing, the Defendant District's Motion to Dismiss is hereby DENIED as to Counts I, II, and X, and as to B.C.'s claims in Counts III and IV.  The remaining claims—Counts V, VI, and VII and the parents' claims in Counts III and IV—are DISMISSED, sua sponte, for lack of subject matter jurisdiction.  Accordingly, the Defendant District's Motion to Dismiss is moot as to these claims.  Lastly, with the exception of the parents' claims in Counts III, IV, and VII, Plaintiffs are afforded leave to amend their Complaint in accordance with this Opinion, on or before **August 30, 2019**.

IT IS SO ORDERED.

DATE _August 15, 2019_

Marilyn J. Horan
United States District Judge